JAMES E. DOROSHOW (SBN 112920)
  jdoroshow@foxrothschild.com
AARON CRAIG (SBN 204741)
  acraig@foxrothschild.com
FOX ROTHSCHILD LLP
1800 Century Park East, Suite 300
Los Angeles, California 90067-3005
Telephone:  (310) 598-4150
Facsimile:  (310) 556-9828
Attorneys for Defendants/Counterclaimants
RENAISSANCE RECOVERY SERVICES,
LLC, NNB RECOVERY SERVICES and
SALVATORE PETRUCCI

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| GRASSHOPPER HOUSE, LLC, a California limited liability company doing business as "PASSAGES MALIBU," PASSAGES SILVER STRAND, LLC, a California limited liability company, <br><br> Plaintiffs, <br><br> v. <br><br> RENAISSANCE RECOVERY SERVICES, LLC, a California limited liability company; NNB RECOVERY SERVICES, LLC, a California limited liability company; and SALVATORE PETRUCCI, an individual <br><br> Defendants. <br><br> AND RELATED COUNTER-CLAIM | Case No.:  10-3198 DMG (JCx) <br><br> Hon. Dolly M. Gee <br><br> **DEFENDANTS' AND COUNTERCLAIMANTS' NOTICE OF MOTION AND MOTION TO DISQUALIFY PLAINTIFFS' COUNSEL AND HIS FIRM AND FOR PROTECTIVE ORDER; MEMORANDUM OF POINTS AND AUTHORITIES** <br><br> **DECLARATIONS OF JAMES E. DOROSHOW AND SALVATORE PETRUCCI IN SUPPORT THEREOF AND (PROPOSED) ORDER FILED CONCURRENTLY HEREWITH** <br><br> Date:  April 4, 2011 <br> Time:  9:30 a.m. <br> Location:  Courtroom 7 <br> Complaint Filed:  April 28, 2010 <br> Trial Date:  October 4, 2011 |

1   PLEASE TAKE NOTICE that on April 4, 2011 at 10:00 a.m., or as soon

2   thereafter as counsel may be heard before the Honorable Dolly M. Gee in

3   Courtroom 7 of the above-entitled Court, located at 312 N. Spring Street, Los

4   Angeles, California, 92701, Defendants and Counterclaimants Renaissance

5   Recovery Services, LLC, NNB Recovery Services, LLC and Salvatore Petrucci

6   ("Renaissance" or "Counterclaimants"), will, and hereby do, move this Court to

7   disqualify Plaintiffs' trial counsel, Charles J. Harder and his firm, Wolf, Rifkin,

8   Shapiro, Schulman & Rabkin, LLP, from further representation of Plaintiffs and

9   Counterdefendants in this matter.  In addition, at such time and place Renaissance

10   will move the Court to stay further discovery by Plaintiffs until such time as the

11   Court enters its final ruling on this Motion.

12   This motion is made on the ground that Mr. Harder and Wolf, Rifkin's

13   representation of Plaintiffs and Counterdefendants in this matter has violated the

14   California Rules of Professional Conduct.  Specifically, it has now been learned that

15   Mr. Harder and his firm have had direct communications and assistance in this

16   litigation from a former Renaissance employee (David Kaiser), who originally

17   consulted with and hired Renaissance's trial counsel (James E. Doroshow) in this

18   litigation, and Mr. Kaiser therefore had and continues to have confidential

19   information obtained in the course of attorney-client communications with Mr.

20   Doroshow which is clearly relevant to this lawsuit.  In addition, Renaissance has

21   recently learned that Mr. Harder and his firm (with the assistance of his clients,

22   including Mr. Kaiser) have engaged in improper, unsolicited, *ex parte*

23   communications with Renaissance's insurer.  Because of these numerous unlawful

24   ethical violations, Mr. Harder and his firm must be disqualified from representing

25   Plaintiffs and Counterdefendants in this matter.

26   In addition, Renaissance requests that this Court order Plaintiffs and

27   Counterdefendants and their counsel to produce to this Court, for *in camera*

28   inspection, all communications concerning the improper, unsolicited, *ex parte*

communications with Renaissance and its carrier; that this Court conduct an evidentiary hearing to determine the nature, scope and extent of Plaintiffs' and Counterdefendants' counsels' violation of the <u>California Rules of Professional Conduct</u>; and that this Court impose sanctions against Plaintiffs and Counterdefendants and their counsel including, by way of example and without limitation, issue preclusion, evidence preclusion, and/or judgment on Renaissance's false advertising counterclaim, and impose monetary sanctions.  To date, Plaintiffs and Counterdefendants have refused to produce Mr. Kaiser for his deposition although Mr. Kaiser's deposition was properly noticed.  Therefore, to the extent this Court requires further evidence to fashion appropriate relief, Renaissance also asks that the Court order Plaintiffs and Counterdefendants to produce Mr. Kaiser for his deposition on a date certain and without further delay.

While this Court is considering, and until it rules on this Motion, Plaintiffs' existing counsel should also not be allowed to continue to litigate this action, including taking depositions or obtaining documents (including confidential documents) from Renaissance.  Accordingly, until such time as the Court issues a final ruling on this Motion, Renaissance asks the Court to issue a protective order staying discovery initiated by Plaintiffs and their current counsel, including staying further consideration and briefing on two motions to compel discovery that Plaintiffs and their current counsel have recently filed or stated they intend to file.

This motion is based on this Notice, the attached Memorandum of Points and Authorities; the attached Declarations of James E. Doroshow and Salvatore Petrucci; the pleadings on file in this action; and any further evidence or argument that the Court may properly receive at or before the hearing.

Plaintiffs'/Counterdefendants' Refusal to Meet and Confer

Renaissance sought to avoid the necessity to seek the disqualification of Mr. Harder and his firm by asking Mr. Harder to meet and confer with Renaissance's counsel concerning disqualification.  Notwithstanding written requests to meet and

1  confer, Mr. Harder failed to do so. *See* accompanying Declaration of James E.

2  Doroshow, ¶67; Ex. J.

3      Accordingly, Renaissance is now forced to bring this motion to disqualify Mr.

4  Harder and his firm because he has refused to meet and confer or otherwise obviate

5  the need to bring this motion

6      This motion is made following unsuccessful attempts by counsel for

7  Renaissance to meet and confer pursuant to L.R. 7.3.

8                                  Respectfully submitted,

9

10  DATED:      March 1, 2011              FOX ROTHSCHILD, LLP

11

12                                  By /s/ James E. Doroshow
                                        James E. Doroshow
13                                      Aaron Craig
                                        1800 Century Park East, Suite 300
14                                      Los Angeles, CA 90067

15                                      Attorneys For
                                        Defendants/Counterclaimants
16                                      Renaissance Recovery Services, LLC,
                                        NNB Recovery Services and Salvatore
17                                      Petrucci

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

Page

I.   PRELIMINARY STATEMENT .................................................................1

II.  FACTS AND PROCEDURAL HISTORY. ............................................4

   A.   The Oregon Action. ..........................................................................4

   B.   This California Action. .....................................................................9

   C.   Grasshopper's Decision and Motivation For Seeking A
       Dismissal of this California Action.................................................9

   D.   Grasshopper's and Its Counsel's Improper Ex Parte
       Communication In The Accelerated Action.................................15

   E.   Attorney Harder's Ethical Violations In This Action. ..............18

      1.   David Kaiser's Role In This Litigation. ...................................19

      2.   Kaiser's Recently Discovered Employment With
         Grasshopper And How He Has Assisted Grasshopper And
         Attorney Harder In This Litigation. .........................................20

      3.   Attorney Harder's Refusal To Confer To Discuss This
         Motion And Refusal To Produce David Kaiser For His
         Deposition. .................................................................................23

III. ARGUMENT ......................................................................................24

   A.   General Legal Standards.................................................................24

   B.   Attorney Harder And His Firm Should Be Disqualified For
       Enlisting David Kaiser To Assist Them In This Litigation
       Against His Former Employer. .....................................................26

   C.   Attorney Harder And His Firm Should Be Disqualified For
       Engaging In Improper Ex Parte Communications With
       Renaissance's Insurer. ...................................................................28

   D.   The Court Should Also Impose Monetary Sanctions To
       Compensate Renaissance For The Expense Of Having To

Prepare and File This Motion. ............................................................33

IV.    CONCLUSION ...........................................................................33

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

C<small>ASES</small>

*Abeles v. State Bar,*
  9 Cal. 3d 603 (1973) .................................................................................. 31

*Aloe Vera of Am., Inc. v. U.S.,*
  376 F.3d 960 (9th Cir. 2004) ................................................................... 25

*American Mut. Liab. Ins. Co. v. Superior Court,*
  38 Cal. App.3d 579 (1974) ...................................................................... 32

*Chambers v. NASCO, Inc.,*
  501 U.S. 32 (1991) ............................................................... 25, 33, 34

*Comden v. Superior Court*
  (1978) 20 Cal.3d 906 (145 Cal.Rptr. 9, 576 P.2d 971, 5 A.L.R.4th 562).... 26, 27

*Fink v. Gomez,*
  239 F.3 989 .............................................................................................. 33

Grasshopper's Decision and Motivation For Seeking
  A Dismissal of this California Action ....................................................... 9

*Gregori v. Bank of America*
  (1989) 207 Cal.App. 3d 291 (254 Cal.Rptr. 853) .................................... 26

*Heavey v. State Bar,*
  551 P.2d 1238 (Cal. 1976) ...................................................................... 30

In the matter of <u>Grasshopper House, LLC, et al. v. Accelerated Recovery</u>
  <u>Centers, LLC, et al.</u>, Case No. 2:09-CV-08128-DMG (PLA) (the
  "*Accelerated Action*") ................................................................. passim

*In re Complex Asbestos Litigation,*
  (1991), 232 Cal.App. 3d 572 ................................................................. 27

*Mitchell v. Superior Court*
  (1984) 37 Cal.3d 591 (208 Cal.Rptr. 886, 691 P.2d 642) ...................... 26

*Mitton v. State Bar,*
  455 P.2d 753 (Ca. 1969) ......................................................................... 30

*Nat'l Hockey League v. Metro. Hockey Club, Inc.*,
   427 U.S. 639 (1976) .................................................................... 25, 33

*People ex rel. Clancy v. Superior Court*
   (1985) 39 Cal. 3d 740 218 Cal. Rptr. 24, 705 P.2d 347.................................. 26

*River West, Inc. v. Nickel*,
   188 Cal.App.3d 1297 (1987) .................................................... 26, 27

*Roadway Express, Inc. v. Piper*,
   447 U.S. 752 (1980) ........................................................................ 33

*State Farm Mut. Auto. Ins. Co. v. Federal Ins. Co.*,
   72 Cal.App.4th 1422 (1999) ........................................................ 32

*Western Continental Operating Co., v. Natural Gas Corp.*,
   212 Cal. App. 3d 752 (1989) ...................................................... 26


**STATUTES**

15 U.S.C. § 1125(a) ................................................................. 9, 10

Bus. & Prof. Code § 6068, subd. (e) ........................................ 26

Cal. Bus. & Prof. Code §§ 17200, *et seq*.................................. 4

*Civ. Code, § 3515* ..................................................................... 27

Code Civ. Proc., § 128, subd. (a)(5).......................................... 26

FTC Act, 15 U.S.C. § 45(a) ....................................................... 12

Lanham Act, 15 U.S.C. § 1125 ................................................... 4


**OTHER AUTHORITIES**

1993 Formal Opinion, No. 1993-131 ........................................ 30

*ABA Comm. On Ethics and Prof's Responsibility*, Formal Op. 95-396 (1995)...... 30

Local Rule 7-3 ............................................................................ 24

Order of Judgment (4) ........................................................................................ 8

Rule 2-100 .................................................................................................... passim

Rule 3-310(d) ........................................................................................... 26, 27

Rule 12 ...................................................................................................... 30, 31

Rule 12(b)(2) ................................................................................................. 5, 6

Rule 26 .................................................................................................... 15, 16

Rule 30(b)(6) ................................................................................................. 14

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    PRELIMINARY STATEMENT

Defendants and Counterclaimants Renaissance Recovery Services, LLC, NNB Recovery Services, LLC and Salvatore Petrucci (collectively "Renaissance") reluctantly seek the disqualification of Plaintiffs' trial counsel, Charles J. Harder, and his firm, Wolf, Rifkin, Shapiro, Schulman & Rabkin, LLP on two grounds.

*First*, it has now been recently confirmed that Plaintiffs have hired Renaissance's former Chief Operating Officer and head of legal affairs (David Kaiser); and that Mr. Kaiser has been enlisted by Plaintiffs' counsel to actively assist counsel in the prosecution and defense of this action.  As Plaintiffs and their counsel are well aware, Mr. Kaiser possesses highly confidential attorney-client information, materially related to this litigation.  *In fact, prior to leaving Renaissance, it was Mr. Kaiser who retained Renaissance's lead trial counsel (James E. Doroshow); and spoke and met with Mr. Doroshow in confidence on several occasions not only to retain him, but to discuss Renaissance's legal strategy in defending this action*.  Having enlisted Mr. Kaiser's active assistance on behalf of their clients in this litigation after Mr. Kaiser left Renaissance's employ, Mr. Harder and his firm cannot possibly overcome the presumption that confidential attorney-client information has been disclosed and used.  Accordingly, the law clearly requires that Mr. Harder and the Wolf Rifkin firm[1] be immediately disqualified from continuing to represent Plaintiffs in this action.

*Second*, in clear violation of the California Rules of Professional Conduct ("RPC"), including, but not limited to, Rule 2-100, which prohibits an attorney from

---

[1] Mr. Harder's firm, Wolf, Rifkin, Shapiro, Schulman & Rabkin, LLP, should be disqualified along with Mr. Harder under the doctrine of vicarious disqualification.  *People ex. rel. Dept. of Corr. v. SpeeDee Oil Change Systems, Inc.,* 20 Cal. 4th 1135 (1999); *Kirk v. First Am. Title Co.,* 183 Cal. App. 4th 776 (2d Dist. 2010).

1   communicating directly *or indirectly* about the subject matter of representation with

2   a person when the attorney knows to be represented by other counsel, RPC 2-100,

3   Mr. Harder and his firm have once again engaged in improper *ex parte*

4   communications with Renaissance's Insurer in this action.  Mr. Harder and his firm

5   are fully aware of this ethical rule; yet have deliberately chosen to ignore it, and not

6   for the first time.  They engaged in the very same ethical violations in a prior case

7   before this Court on behalf of the same clients in the matter of <u>Grasshopper House,</u>

8   <u>LLC, et al. v. Accelerated Recovery Centers, LLC, et al.</u>, Case No. 2:09-CV-08128-

9   DMG (PLA) (the "*Accelerated Action*").[2]

10      Now, *for a second time,* Mr. Harder and his firm have directed their clients to

11  engage in the very same unethical conduct in this action.  Indeed, this is indisputable

12  from a series of emails Renaissance has now obtained from its Insurer.  See

13  Doroshow Decl., ¶¶63-67, Ex. J.

14      Mr. Harder's and his clients' intent is obvious.  Consistent with their course

15  of conduct throughout this litigation, and in the prior *Accelerated Action*,

16  Plaintiff/Counterdefendants Grasshopper House, LLC and Passages Silver Strand,

17  LLC (collectively, "Grasshopper") and their principals, Counterdefendants Chris

18  and Pax Prentiss ("Prentiss"), are trying to undermine Renaissance's ability to

19  continue prosecuting its false advertising counterclaim.  Knowing full well that they

20  face almost certain liability for falsely representing they have a "cure" for addition,

21  and purportedly have "cured" 84% of their patients, Grasshopper recently chose to

22  seek a voluntary dismissal of its claims in the hope of depriving Renaissance of

23  insurance money to continue funding this litigation.  Confronted by Renaissance's

24

25  _____

26  [2] While *Accelerated* filed a motion for a protective order in the prior litigation to address counsel's
    ethical violations in engaging in improper ex parte communications with their insurer in that

27  matter, the matter settled before the Court ever heard or ruled on that motion.  Doroshow Decl.
    ¶12.

28

opposition to Grasshopper's proposed dismissal of its claims, Grasshopper, Prentiss, and their counsel, once again conspired to undermine Renaissance's relationship with its counsel, Fox, and its Insurer.  More specifically, as they did in the *Accelerated Action*, after learning of Renaissance's opposition to Grasshopper's *Motion to Dismiss First Amended Complaint* (10-3198 Dkt. 40), unbeknownst to Fox, Prentiss and David Kaiser engaged in improper, unsolicited, *ex parte* communications with Renaissance's Insurer at the behest and under the direction of Mr. Harder and his firm.  The sole purpose of such communications, as in the *Accelerated Action*, was to try to deprive Renaissance of financial resources and thereby coerce Renaissance into dismissing its counterclaims in this action.  At no time did anyone seek or secure Fox's consent to such improper communications with its clients.  In fact, Renaissance's counsel was not even aware of them until after this Court granted Grasshopper's motion to dismiss Grasshopper's claims on February 11, 2011.  (10-3198 Dkt. No. 47).

As discussed more fully below, the RPC prohibits attorneys from drafting documents, correspondence, or other written materials to be delivered to an opposing party represented by counsel even if they are prepared at the request of the client, are conveyed by the client and appear to be from the client rather than the attorney.  The RPC also prohibits Grasshopper's and Prentiss' counsel from scripting the questions to be asked or statements to be made in the communications or otherwise using the client as a conduit for conveying to the represented opposing party words or thoughts originating with the attorney.

Here, Grasshopper's and Prentiss' counsel are attempting to hide behind the cloak of privilege to shield from the eyes of this Court their own misconduct and, thus, have refused to provide any information relating to their numerous ethical violations, including refusing to produce Mr. Kaiser for his deposition and refusing to confer with Renaissance's counsel before this motion was filed.  Renaissance therefore submits that, in addition to disqualifying Mr. Harder and his firm, this

1  Court can and should require Grasshopper, Prentiss and their counsel to submit to

2  the Court for *in camera* inspection all documents, communications, and electronic

3  information relating to Mr. Kaiser's involvement in this action and as to their

4  improper *ex parte* communications with Renaissance's Insurer so the Court can

5  determine the nature, scope and extent of the violations and so that appropriate

6  sanctions can be imposed.

7  **II.    FACTS AND PROCEDURAL HISTORY**

8       **A.    The Oregon Action**

9       This is the second action Plaintiffs have brought against Renaissance and its

10  owner, Salvatore Petrucci.  On July 7, 2009, Plaintiffs, Grasshopper House LLC

11  d./b/a "Passages Malibu" and Passages Silver Strand LLC (collectively,

12  "Grasshopper"), brought an action against Defendants Renaissance Malibu

13  Foundation (the "Foundation"), Accelerated Recovery Centers ("Accelerated") and

14  others in the United States District Court of Oregon (Case No. 3:09-CV-778-HA)

15  (the "Oregon Action").  In the Oregon Action, Grasshopper asserted claims against

16  the Defendants for, *inter alia*, trademark infringement and unfair competition in

17  violation of the Lanham Act, 15 U.S.C. § 1125, and unjust enrichment.  For its part,

18  the Foundation was and is a 501 (c)(3) non-profit organization organized under the

19  laws of the State of California.  (Declaration of Salvatore Petrucci, at ¶2.)   Indeed,

20  the Foundation exists only for the purpose of providing scholarships and other

21  financial services for persons who wish to utilize drug and alcohol rehabilitation

22  services, but cannot afford to do so.  *Id*. at ¶2.

23       Neither the Foundation nor Accelerated ever had any connection with the

24  State of Oregon.  *Id*. at ¶3.  Despite their lack of any activities in Oregon, Plaintiffs

25  nevertheless brought suit against the Foundation and Accelerated in the United

26

27

28

1 States District Court of Oregon.[3]

2     As they would later allege here, Plaintiffs asserted in the Oregon Action that

3 Defendants allegedly used Plaintiffs' trademarks and trade names in online

4 advertisements through Google Ads. In their Complaint, Plaintiffs alleged that

5 Defendants, including the Foundation, "use various domain names in advertising

6 their alcohol and drug addiction facilities." (OR 09-778 Dkt. 1, at ¶3.) However,

7 the Foundation is not and never was an alcohol and drug addition facility, nor did it

8 advertise online using any trademarks or trade names asserted by the Plaintiffs.

9 (Petrucci Decl. at ¶2.) On the contrary, as noted, the Foundation was and is a

10 501(c)(3) organization that exists for the purpose of providing "scholarships" and

11 other financial services for person who wish to utilize rehabilitation services, but

12 cannot afford to do so. (Petrucci Decl. at ¶2.) As a result, the Foundation never

13 engaged in any of the activities alleged by Plaintiffs.

14     Pursuant to Rule 12(b)(2), for its part, Accelerated filed a motion to dismiss

15 Plaintiffs' Complaint for lack of jurisdiction on August 13, 2009. The Oregon Court

16 granted Accelerated's Motion on October 15, 2009, dismissing Accelerated from the

17 case for lack of jurisdiction. (OR 09-778 Dkt. 37.) In its Opinion granting

18 Accelerated's Motion to Dismiss (OR 09-778 Dkt. 38), the Court held that Plaintiffs

19 failed to establish "that defendant has, in any way, expressly aimed its advertising

20 scheme at the residents of Oregon," and that "the operation of a passive website

21 cannot satisfy the aiming prong of the "Calder effects" test without "something

22 more." (Dkt. 38, at 6, *citing Pebble Beach v. Caddy*, 453 1151, 1158 (9th Cir.

23 2006).) Because Plaintiffs conceded that the Court lacked general jurisdiction over

24

25 _____

26 [3] According to their Complaint in the Oregon Action, Plaintiffs are also located in California. (OR 09-778 Dkt.1 at ¶1.) Moreover, Plaintiff's Complaint asserted no state claims arising under the laws of Oregon. Plaintiffs did however assert one count against all of the Defendants for

27 "California Unfair Competition" pursuant to Cal. Bus. & Prof. Code §§ 17200, *et seq.*

28

Accelerated and, further, failed to satisfy even the first prong of the specific personal jurisdiction test, the Court concluded that it lacked personal jurisdiction over Accelerated and therefore dismissed Accelerated from the case. *Id*. at 6. The Court further rejected Plaintiffs' request to conduct jurisdictional discovery concerning Accelerated's business activities in Oregon, as the Court suggested that Plaintiffs' request was "clearly frivolous" and based "on little more than a hunch" that such discovery would yield facts relevant to establish the Court's jurisdiction over Accelerated. *Id*. at 6-7.

Since the Foundation similarly conducted no business activity or presence in Oregon—and believed both that the Oregon Court lacked jurisdiction over it and that Plaintiffs had brought suit against the wrong party—the Foundation did not file a response to the Oregon Complaint. On October 2, 2009, Plaintiffs filed a Motion for Default, which was subsequently granted by the Court seven (7) days later. (OR 09-778 Dkt. 30, 35.) Significantly, Plaintiffs did not serve their Motion for Default upon the Foundation prior to the entry of default. (Petrucci Decl. at ¶5.) Plaintiffs chose instead to serve the notice of default upon the Foundation, through its registered agent on October 21, 2009, *after* the Default had already been entered. (*See* Id.; Declaration of Melissa Smith (OR 09-778 Dkt. 53), at ¶8.)

Plaintiffs subsequently filed a Motion for a Default Judgment against the Foundation on November 3, 2009. (OR 09-778 Dkt. 42.) In its Motion, recognizing they had sued the wrong party, Plaintiffs sought the entry of a judgment for monetary damages and injunctive relief against not only the Foundation, but also against "all persons or entities acting in concert with defendant Renaissance Malibu Foundation." *Id*. Again, Plaintiffs did not serve their Motion for Default Judgment upon the Foundation or any of the parties that Plaintiffs later contended were bound by the injunction they requested. (Petrucci Decl. at ¶6.) On November 5, 2009, the Court directed Plaintiffs to file a proposed Order of Judgment against the Foundation, which Plaintiffs subsequently filed on November 11, 2009, (OR 09-778

Dkt. 44, 47.)  Plaintiffs' Proposed Order of Judgment sought the following relief:

> IT IS FURTHER ORDERED *that defendant Renaissance Malibu Foundation, and its officers, directors, employees, agents, servants, and all persons, firms, corporations, franchisees and associates in concert or participation with Defendants* are permanently enjoined from doing any of the following:
>
> a.     conducting or doing business, in any capacity, using plaintiffs' trade dress or trademarks, or any confusingly similar marks, trade dress, designations or variations thereof;
>
> b.     using the plaintiffs' trademarks "Passages", "Passages Silver Strand" and "Passages Malibu" or trade dress, or any confusingly similar marks, trade tress, derivative or form thereof, in connection with the advertisement, sale or offering for sale of good s and services, including (i) use in any internet advertising programs Including as test, headlines or keywords), promotional materials, and web sites; (ii) use as a targeted keyword phrase in internet advertising; and (iii) use as Google Adwords or similar search engine advertising use.
>
> c.     falsely or inaccurately describing or designating the origin of or other facts related to any goods or services in any manner that is likely to cause confusion, mistake or deception as to the affiliation, connection and association of defendant Renaissance Malibu Foundation with Plaintiffs;
>
> d.     engaging in any conduct violative of 15 U.S.C. § 1125(a);
>
> e.     engaging in any conduct violative of Cal. Bus. & Prof. Code § 17200.

(emphasis added).[4]

In May 2010, approximately six (6) months after the Judgment was entered, Plaintiffs suddenly contended that the judgment bound not only the Foundation, but also its CEO, Salvatore Petrucci ("Petrucci"), as well as alleged affiliated entities of

---

[4]     Once again, the docket in Oregon does not reflect any attempt made by the Plaintiffs to serve their proposed Order of Judgment upon the Foundation or any of the parties that potentially could be subject to the Order, prior to the entry of the Judgment.  The Foundation had no prior notice as to Plaintiffs' Motion or the scope or breadth of the proposed Judgment, did not oppose Plaintiffs' Motion and, on November 16, 2009, the Court entered the Order of Judgment proposed by Plaintiffs.  (OR 09-778 Dkt. 48.)  Only after the Court entered the Judgment did Plaintiffs purportedly attempt to notify the Foundation, through its registered agent, as to the Judgment sought by Plaintiffs and entered in the Court.  (*See* Declaration of Melissa Smith (OR 09-778 Dkt. 53), at ¶9.)

the Foundation, Renaissance Recovery Services, LLC and NNB Recovery Services, LLC (collectively, "Renaissance"). (*See* Declaration of Melissa Smith (OR 09-778 Dkt. 53), at ¶10.) However, at the same time, Plaintiffs did not dispute that Petrucci and Renaissance (collectively, the "*Unnamed Defendants*"): (1) were never named as Defendants in this action, (2) were never served with process in the Oregon action, (3) were never provided with prior notice of Plaintiffs' Motion for Default Judgment or the proposed Order of Judgment, (4) were never given an opportunity to object to the proposed Judgment, (5) were never served with the Judgment after it was entered, and (6) were never forewarned or told that the injunctive relief sought or obtained by Plaintiffs would purportedly apply to them. (Petrucci Decl. at ¶6.) In addition, Plaintiffs also did not dispute that, much like the Foundation, the Unnamed Defendants all resided in California and conducted no business and had no other connection with the State of Oregon. Therefore, the Order of November 16, 2009 was clearly void as against the Foundation and the Unnamed Defendants for lack of jurisdiction. Despite these facts, Plaintiffs nevertheless filed a Motion for Sanctions with the Court on May 25, 2010, seeking the imposition of sanctions against the Foundation and the Unnamed Defendants based on their alleged violation of the Judgment. (Petrucci Decl. at ¶7.) In response to Plaintiffs' Motion for Sanctions, Renaissance and Petrucci filed a Motion Vacate the Default Judgment and Dismiss for Lack of Personal Jurisdiction. (OR 09-778 Dkt. 59.)

On July 19, 2010 the Oregon Court (Hon. Andrew L. Haggerty) granted Renaissance's Motion to Vacate the Default Judgment and Dismiss for Lack of Personal Jurisdiction, dismissing the Oregon Action, finding, as it had previously done with Accelerated, that the Foundation had done nothing in Oregon, was not subject to jurisdiction in Oregon, and the default judgment and permanent injunction previously entered against the Foundation were void and therefore must be vacated. (OR 09-778 Dkt. 67.)

B.     **This California Action**.

On April 28, 2010, before asserting that the Unnamed Defendants were bound by the Oregon Court's November 16, 2009 Judgment, Plaintiffs filed this lawsuit against Renaissance and Petrucci in this Court, styled <u>Grasshopper House, LLC, d/b/a "Passages Malibu" and Passages Silver Strand, LLC, a California limited liability company v. Renaissance Recovery services, LLC, NNB Recovery Services, LLC and Salvatore Petrucci</u>, Case No. CV-10-3198-DMG-JCx (the "California Action").

Despite Plaintiffs' contentions that the Unnamed Defendants were somehow bound by the Oregon Court's November 16, 2009 Judgment, the factual allegations and claims asserted by Plaintiffs against Renaissance and Petrucci in this California Action were virtually identical to those asserted against the Foundation in Oregon. As in Oregon, Plaintiffs asserted claims against Renaissance and Petrucci in this Action for trademark infringement and unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a), and unjust enrichment.  Moreover, in this California Action, Plaintiffs sought monetary damages and essentially the identical injunctive relief that was granted by the Court in the November 16, 2009 Judgment, before it was vacated.  *See* Complaint (10-3198 Dkt. 1.)

Thus, the relief sought by the Plaintiffs against Renaissance and Petrucci in this California Action was essentially identical to the relief that Plaintiffs' claimed they had already obtained against them by virtue of the November 16, 2009 Order in the Oregon Action.  Plaintiffs failed to explain why their claims against Renaissance and Petrucci in this were not duplicative of the Judgment Order in Oregon.

C.     <u>**Grasshopper's Decision and Motivation For Seeking A Dismissal of this California Action**</u>.

Having forced Renaissance and Petrucci to litigate the same identical claims in two separate forums *for a year and a half*, on January 31, 2011, Plaintiffs suddenly moved to dismiss their Complaint in this action.  As in the *Accelerated*

*Action*, Grasshopper's motivation for doing so was obvious.  Grasshopper and its counsel recognized they face almost certain liability for falsely advertising they can "cure" alcoholism, and have an 84% "cure" rate in doing so.  Accordingly, Grasshopper has calculated that by dismissing its own claims, Renaissance's Insurer would stop funding this litigation, and thereby deprive Renaissance of funds needed to continue financing Renaissance's counterclaim for false advertising.

As Accelerated did before it, Defendants filed a counterclaim in this action against Plaintiffs (and persons associated with Plaintiffs, including Grasshopper's owners, Chris and Pax Prentiss) unfair business practices (i.e., false advertising) under the Lanham Act, 11 U.S.C. § 1125(a)[5]  As set forth in greater detail below, Defendants seek to hold Plaintiffs liable for their outrageous and clearly false claim that they can "cure" alcohol and drug addiction, and for falsely representing that they have an 84% success rate in doing so.  Among other places, Plaintiffs have made such false claims in infomercials and other advertisements, on their websites, and in a book authored by Chris Prentiss, "The Alcoholism and Addiction Cure." While Plaintiffs have now dismissed all of their claims against Renaissance, Renaissance intends to continue presenting its false advertising counterclaim, and this Court has ordered this counterclaim remain pending for further adjudication. See Order entered February 11, 2011 (10-3198 Dkt. 47).

Renaissance's counterclaim is based upon the following set of indisputable facts:

In connection with advertising their drug and alcohol rehabilitation goods and services, Counter-Defendants have made and continue to make false and misleading

---

[5]   While Defendants had also filed two additional counterclaims for a declaration of noninfringement of Grasshopper's marks and nonregisterability of those marks, Renaissance has now moved to dismiss those claims for lack of justiciability now that Grasshopper has dismissed its claims.  (10-3198 Dkt. 45).  Grasshopper filed a Notice of Non-Opposition on March 1, 2011, joining the motion to dismiss the two declaratory judgment counterclaims.  (10-3198 Dkt. 53.)

statements in commerce, including that they purportedly know how to "cure" alcoholism and addiction, even though they know and fully understand that there is no permanent "cure" for addictive disease.  Moreover, Grasshopper and Prentiss have falsely claimed that they have an 84% "cure" or "success" rate in treating alcoholism and other addictive disease; when, in fact, they have no data to support this claim.  Counter-Defendants also falsely claim that Pax Prentiss has been "cured" for over a decade from his addiction to heroin and other substance abuse; when, in fact, the evidence in this case (including correspondence Chris Prentiss himself wrote and sent to the California Labor Board) shows this to be unquestionably false and misleading.

Counter-Defendants, and/or their agents, officers and others acting in concert with them, have made and are continuing to make false and misleading statements of material fact in their attempt to promote their addiction treatment facilities and related services, including in informational commercial advertisements ("infomercials") that are being aired to this day.

Among other forms of misleading advertising, Counter-Defendants have caused to be released commercial advertisements, statements or both claiming to be able to "cure" drug, alcohol and other forms of addiction; despite the fact Counter-Defendants fully know and understand that there is no permanent "cure" for addictive diseases.  Grasshopper and Prentiss make such statements to consumers of alcohol and drug rehabilitation services in order to induce consumers to use Counter-Defendants' services.

For example, Counter-Defendants' website features an infomercial promoting Chris Prentiss' book and the services offered by Grasshopper in which Chris Prentiss, speaking on behalf of himself and the other Counter-Defendants, repeatedly makes false claims that they have learned how to "cure" addiction and alcoholism.

For his part, Counter-Defendant Donald Barrett produced the infomercial and

also "interviewed" Chris Prentiss in the infomercial.  In the infomercial, Barrett states that Chris Prentiss' program described in the book "is helping people over the world get cured from alcohol or drug addiction."  Barrett also states "His book is called Alcohol and Addiction Cure. … <u>Cure</u>."   In another segment, he states, "if you would like some more information on The Alcoholism and Addiction Cure by Chris Prentiss, and it's a cure, go to [www.theaddictioncure.com](http://www.theaddictioncure.com)."  Finally, Counter-Defendant Barrett has represented that, "Some people have been cured just by reading this book."[6]

Among other misleading material, Plaintiffs and Chris and Pax Prentiss maintain a webpage at the domain www.theaddictioncure.com which is owned by Grasshopper and is used to sell its products and services.

In the webpage from Grasshopper's website, Counter-Defendants state:

- **We know how to cure dependency.**
- Our therapists, **9 of them**, work as a team to cure the underlying causes of dependency on alcohol, drugs, and other addictive behavior.
- Our clients receive **60 hours of individual therapy a month** with therapists who are among the finest in the country, all of whom believe we can cure dependency.

---

[6]    Counter-Defendant Barrett has a history of producing and participating in deceptive and false infomercials.  For example, in 2007, the Federal Trade Commission ("FTC") named Barrett as a co-defendant in a civil action in the United States District Court for the District of Massachusetts for deceptive acts or practices in connection with the advertising, promotion, and sale of a book entitled "The Weight Loss Cure 'They' Don't Want You To Know About," in violation of the FTC Act, 15 U.S.C. § 45(a).  (See Civ. No. 07-11870-GAO).  This book was also the subject of a civil action brought by the FTC in the United States District Court for the Northern District of Illinois, Eastern Division, against the author of the book, Kevin Trudeau.  (FTC v. Kevin Trudeau, Civ. No. 03-C-3904).  In this proceeding, Kevin Trudeau was found to be in contempt of his previous injunction for misrepresenting the context of the book.

Prior to the 2007 proceeding, Barrett was also named as a co-defendant in a civil action in the United States District Court for the District of Massachusetts brought by the FTC for deceptive practices and false advertisement in connection with the sale of dietary supplements.  (Civ. No. 04-11136-GAO).  In that proceeding, the FTC alleged that, to induce consumers to buy their products, defendants in that action disseminated false and deceptive advertisement and promotional materials, including infomercials again featuring Kevin Trudeau.  Dororshow Decl. ¶¶ 33-34.

(emphasis in the original).

Among other false and misleading information, in the webpage from Grasshopper's website, Plaintiffs and Chris and Pax Prentiss also provide names and credentials of nine therapists on staff that claim to "know how to cure dependency."

In Counter-Defendant Chris Prentiss' book entitled "The Alcoholism and Addiction Cure," Chris Prentiss also claims unequivocally that he can stop patients from drinking or engaging in other forms of substance abuse; not merely treat them. In the same book and elsewhere, Pax Prentiss and his father also claim that he and his father also have "cured" Pax Prentiss from using heroin and other substances; and that he has not used heroin, alcohol or other drugs for over a decade. In truth, the evidence in this case (including a letter Chris Prentiss himself wrote to the California Labor Board) is contrary to this claim.

Grasshopper and Prentiss have also made the remarkable and totally false claim that they have an 84 percent success rate in "curing" people from addiction. As stated by Chris Prentiss (at page 160) of his book entitled "The Alcoholism and Addiction Cure:"

> "One of the strongest beliefs clients have at Passages  is that relapse seldom occurs among our clients. *They believe that sobriety is the norm.  Of the people who have graduated from Passages, fewer than 16 percent have relapsed*.  This incredible success rate is the opposite of the National relapse rate, which, as I mentioned before, is estimated to be nearly 80 percent overall for those using any illicit drugs and 86 percent for users of alcohol and heroin." (Emphasis supplied.)

According to a June 26, 2008 LA Weekly Journal article, Chris and Pax Prentiss were pictured in front of their garish $23 million Malibu mansion, where they receive upwards of $70,000 a month from unsuspecting patients and their desperate families as a direct result of their false claims.

In April 2007, Chris and Pax Prentiss appeared on a television segment for *Paula Zahn Now*, in an interview with CNN's Brook Anderson.  In the television interview, the following exchange was reported:

> ANDERSON:  "The Prentiss duo…claim a success rate of better than 80 percent and even wrote a book about their unconventional approach.  They reject the decades–old 12-step program and proudly defy scientific studies about addiction.  Doctors, scientists say addiction is a disease.  You say it's not."
> PRENTISS:  "I know it's not."
> ANDERSON:   "When you send patient's home, what do you say to them?,"
> PRENTISS:  "*You're cured.  Totally*."  "*You will never use drugs and alcohol again.  Your dependency has been cured*.  Have a wonderful life."

(emphasis supplied).

Grasshopper's and Prentiss' claim of an 80 percent "cure" rate has already been proven to be false in the *Accelerated Action* before it was settled.  As noted, the *Accelerated Action* involved nearly identical claims, counter-claims and affirmative defenses.  Notably, in the *Accelerated Action*, Plaintiffs and Counter-Defendants were represented by the same counsel representing them in these proceedings.  In the *Accelerated Action*, when Prentiss appeared for a Rule 30(b)(6) deposition he laid to rest any doubt on this issue.  Thus, even though he and Plaintiffs have continued to claim an eighty percent cure rate in his book and other material at least as late as 2008, in filings and supplemental interrogatory responses in the *Accelerated Action*, and his 30(b)(6) deposition in the *Accelerated Action*, *Plaintiffs and Prentiss admitted that they "discontinued the practice of compiling information regarding its success rate in or about the beginning of 2004."  What's more, Prentiss has testified that his unfounded claim of an 84% success rate was simply based upon random telephone calls that a Grasshopper employee made for a month or two after patients were discharged from the facility, with absolutely no*

*follow-up after that date.  At the same time, Prentiss has also testified that at the time he supposedly acquired information from former patients about their purported success rate, Grasshopper had just opened and was a much smaller facility with a much smaller patient population.*

In addition, former Grasshopper consultants (including Grasshopper's own former medical director, Dr. Jason Giles) testified in the *Accelerated Action* that based upon his experience while at Grasshopper *he in fact experienced a 70% relapse rate; quite the opposite of the 84% "cure" rate represented by Grasshopper and Prentiss.*[7]

## D.   Grasshopper's and Its Counsel's Improper Ex Parte Communication In The *Accelerated Action*.

This is not the first time that Grasshopper, Prentiss and their counsel (Charles Harder) have engaged in improper *ex parte* communications with an opposing party's Insurer.  In fact, they did the same exact thing in the *Accelerated Action* before it settled.

On May 10, 2010, when Accelerated filed its Amended Counterclaims, Accelerated also served its Rule 26 Initial Disclosures in which, among other things, Accelerated advised that it was being defended in its lawsuit by its insurer.  *See* September 13, 2010 Declaration of James E. Doroshow in Opposition To Plaintiff's Motion To Dismiss The First Amended Complaint Without Prejudice And Without Costs ("Doroshow 9/13/10 Decl.") (09-8128 Dkt. 78-1) at ¶3.

Before the *Accelerated Action* settled, Accelerated vigorously defended itself for eleven months against Grasshopper's trademark claims, at a cost of several hundred thousand dollars.  It also doggedly pursued its own counterclaims, including the same false advertising claims that are now the subject of

---

[7]   Renaissance will soon be filing a Motion for Summary Adjudication to address the falsity of Grasshopper's claims, and will be seeking the entry of judgment on its counterclaim.

Renaissance's counterclaim in this action.  *See Id.* ¶13.  As they have done in this action, when faced with almost certain liability for falsely claiming they have a "cure" for addiction, Grasshopper and Prentiss moved to dismiss their claims against Accelerated calculating that, by doing so, Accelerated would have no remaining insurance needed to continue funding its false advertising counterclaims. Specifically, on September 2, 2010—roughly six weeks before the discovery cut-off date—Grasshopper asked this Court to allow Grasshopper to dismiss all of its affirmative claims *without prejudice and without costs.*  (09-8128 Dkt. 76).[8]

Accelerated however refused to capitulate.  On September 13, 2010, Accelerated filed its opposition to Grasshopper's motion to dismiss.  (09-8128 Dkt. 78.)  In its response, Accelerated detailed the significant prejudice Accelerated would suffer if Grasshopper were permitted to dismiss its claims without prejudice including, among other things, the fact that Accelerated "will lose its legal right to indemnify and defense from its insurer."  (09-8128 Dkt. 78-1).  In connection with this filing, Accelerated's President and Chief Executive Officer, Kevin M. Kelly, provided a Declaration, dated September 13, 2010, in which he clarified that, "(t)o date, Accelerated, has been defended in this action by the Hanover Insurance Group ("Hanover") under a Businessowners Insurance Policy (the "Hanover Policy")." Doroshow Decl., Ex. K, at ¶10

Within days of receiving Accelerated's opposition to Grasshopper's motion to dismiss, together with its President/CEO Kevin M. Kelly's Declaration, improper *ex parte* communications were made by Grasshopper and its counsel (Charles J. Harder) to Accelerated's Insurer, Hanover.  These communications included a telephone call to the Insurer as well as an e-mail to the Insurer enclosing various documents relating to this litigation – including copies of pleadings and prior

---

[8]   As he is in this Action for Renaissance, James E. Doroshow was lead counsel for Accelerated in the *Accelerated Action*.

settlement communications from Prentiss to Kelly. *See* Doroshow Decl., Ex. B; *see also* Doroshow Decl., Ex. L (Second Supplemental Declaration of James E. Doroshow dated September 22, 2010) at ¶3.

In particular, on Friday, September 17, 2010 counter-defendant Chris Prentiss called Hanover's John K. Colleton and advised that he, Prentiss, and Accelerated "are involved in a lawsuit involving trademark infringement and that- he wanted to email Hanover some info(rmation) . . . to ensure that (Hanover) (is) not overbilled." *See* Doroshow Decl., Ex. B. Later, that same day, Prentiss sent an e-mail to Accelerated's Insurer, attaching copies of pleadings in the action and prior settlement communications between the parties. *Id.* At no time did Grasshopper, Prentiss and/or their counsel seek or obtain consent from Mr. Doroshow or his firm to communicate *ex parte* with Accelerated or the Insurer.

On Tuesday, September 21, 2010, James E. Doroshow, Esquire, Accelerated's counsel of record in the *Accelerated Action*, was informed by the Insurer that the Insurer had received unsolicited, *ex parte* communications from Prentiss. Doroshow Decl., Ex. L at ¶3. Promptly after discovering this latest abuse, Mr. Doroshow contacted Mr. Harder and requested copies of Prentiss' communications and asked Mr. Harder to confer regarding this serious breach of the RPC.

As he has done in this action, Mr. Harder did not respond or provide the requested information. Accordingly, the following day, Mr. Doroshow prepared and filed with this Court his Second Supplemental Declaration in opposition to Grasshopper's Motion to Dismiss, detailing the then-known facts and circumstances of counsel's improper, *ex parte* communication. *See* Doroshow Decl., Ex. L. Shortly thereafter, Mr. Doroshow again contacted Attorney Harder attaching the hyperlink to his recently-filed Declaration, and asking for an explanation and a copy of the unsolicited communication sent by Prentiss. Doroshow Decl., Ex. C. Grasshopper's and Prentiss' counsel again did not provide the requested information

1   or any explanation.  *See Id*.

2   In addition, Mr. Doroshow attempted to schedule a meet-and-confer regarding

3   this and other discovery matters with Attorney Harder.  On Thursday, September 23,

4   2010, in the presence of a Court Reporter who transcribed the discussion, Mr.

5   Doroshow met with Mr. Harder.  At that time, Mr. Doroshow asked whether Mr.

6   Harder or anyone else representing Chris Prentiss, Grasshopper, or any of the other

7   parties in the suit knew about Prentiss' communications.  *See* Doroshow Decl., Ex.

8   D (Excerpts of September 23, 2010 Transcript of Meet and Confer) at 13.  Mr.

9   Harder however declined to respond, claiming that the question called for attorney-

10  client privileged communications.  *Id*. at 13-14.

11  Over the course of the next several weeks, Mr. Doroshow continued to try to

12  schedule a meet-and-confer with Mr. Harder to address his improper *ex parte*

13  communications.  *See, e.g.,* Doroshow Decl., Ex. E (Letter dated October 6, 2010,

14  from James E. Doroshow to Charles J. Harder, Esq.) at 3 (stating, "I stand ready,

15  willing and able to meet to this day with you and Mr. Nitti this week to discuss

16  deposition scheduling if you would simply agree to discuss with me our

17  contemplated motion regarding your improper, ex parte communications at the same

18  time. Are you prepared to do so?  If so, please propose a date and time.")  Once

19  again, Mr. Harder did not respond.  *Id.*

20  Accordingly, on October 12, 2010, Accelerated and Mr. Doroshow filed a

21  Motion for Protective Order to address counsel's unexplained ethical violations.

22  The *Accelerated Action* however settled before this Court could hear this Motion.

23  **E.    Attorney Harder's Ethical Violations In This Action.**

24  Mr. Harder and his firm are now at it again in this action.  The present

25  circumstances however are even worse.  Not only have Mr. Harder and his clients

26  now engaged in the same improper *ex parte* communications with Renaissance's

27  Insurer, they have now hired and are actively working with a former Renaissance

28  employee (David Kaiser), who previously hired Renaissance's lead counsel in this

action (James E. Doroshow), and who clearly has privileged and confidential

information material to this litigation.

### 1.   David Kaiser's Role In This Litigation.

David Kaiser was formerly employed by Renaissance as its Executive

Director, Chief Operating Officer and Court Liaison.[9]  Mr. Kaiser worked at

Renaissance for twenty (20) months, from June 2008 through January 2010.

Doroshow Decl., ¶52.  As such, he was unquestionably within Renaissance's control

group at Renaissance at the time Grasshopper initially filed suit in Oregon in July

2009.[10]  In fact, according to Mr. Kaiser's own sworn testimony in the Oregon

Action, it was Mr. Kaiser who first received a copy of the Complaint and Judgment

in the Oregon Action, and who retained Renaissance's lead trial counsel (James E.

Doroshow) to defend Renaissance against Grasshopper's claim in Oregon and

elsewhere.[11]  After receiving notice of the filing of the Oregon Complaint, Kaiser

testified he did the following:

> "I contacted Lisa Bruno (Renaissance's Chief Financial Officer) and I
> contacted Amy Petrucci (Sal Petrucci's wife and Renaissance's Vice
> President) and I contacted Sal (Petrucci) and told them that this was
> the case, *and because I handled a lot of their . . . I was liaison for*
> *certain legal . . .*
>
> * * * *
>
> *I interfaced with counsel on their behalf on several occasions, and*

[9]   After hiring Mr. Kaiser, Renaissance later learned that Mr. Kaiser was a convicted felon.
Kaiser has himself testified he was convicted of wire fraud in 2000.  Doroshow Decl., Ex. F at  65.

[10]   Mr. Kaiser reported to Defendant Salvatore Petrucci during his employment at Renaissance.
Mr. Petrucci was and is the owner and Chief Executive Officer of Renaissance.  Petrucci Decl. at
¶2.  Mr. Kaiser has testified under oath that he was hired as part of the "corporate team" when
employed at Renaissance and was listed by Renaissance on its website as "Chief Operating Officer
and court liaison."  He also has confirmed that he was an "officer" of the Foundation at the time it
was sued in Oregon.  Doroshow Decl. at ¶52, Ex. F.

[11]   Mr. Kaiser was not working at Grasshopper at the time he testified in the Oregon Action on
July 15, 2010.  Doroshow Decl., Ex. F at 14.  Thus, apart from testifying as a witness, Renaissance
had no reason to believe Mr. Kaiser was sharing confidential information with Grasshopper and its
counsel at the time he testified in Oregon.  *Id.*

*when we got this,(the Oregon Complaint and summons), I went to retain counsel.*"[12]

Doroshow Decl., ¶53, Ex. F at 39. (emphasis supplied).

Similarly, when asked if he had seen a copy of the Oregon Judgment against the Foundation, Kaiser testified as follows:

"Well, I did, *because that's when I retained Jim Doroshow (Renaissance's lead trial counsel) and turned this over to him (in December 2009)."  Id.* ¶54, Ex. F at 41 (emphasis supplied).

And, when asked to confirm when he had seen the Oregon Judgment, Kaiser testified:

"It had to be -- it had to be early – it had to be early January (2010) or the latter part of December (2009) or mid January.  *I would have to look when my meeting with Jim Doroshow was, because the meeting applied to this.*"

*Id.* at ¶54, Ex. F at 42 (emphasis supplied).

Should there be any lingering doubt about Mr. Kaiser's role in retaining Mr. Doroshow to defend Renaissance, Kaiser laid it to rest:

————————

"Q.  *Mr. Kaiser, you said you retained an attorney in response to getting a copy of this (Oregon) Judgment?*
A.  *Yes.*
Q.  *And the attorney's name is?*
A.  *James Doroshow.*"

*Id.* (emphasis supplied).

### 2. <u>Kaiser's Recently Discovered Employment With Grasshopper And How He Has Assisted Grasshopper And Attorney Harder In This Litigation.</u>

While Renaissance is obviously reluctant to disclose attorney-client communications that took place with Kaiser when Kaiser retained Mr. Doroshow to

---

[12]  Mr. Kaiser also testified that ". . . anything legal had to end up on my desk, and it was my job to act on it however – whether it be to retain counsel or to . . . really to retain counsel."  *Id.*, Ex. F. at p. 59.

represent Renaissance in this litigation, with this Motion, Mr. Doroshow has submitted a sworn declaration confirming what Kaiser himself testified to in Oregon.   At this same time, Mr. Doroshow also confirms that when he was hired to defend this action, he and Kaiser discussed in confidence Grasshopper's claims, including strategy relating to how to defend them, as well as Renaissance's false advertising counterclaim against Grasshopper and Prentiss that still remains active in this litigation.  Doroshow Decl., ¶56.

Renaissance does not currently know all of the facts and circumstances relating to Mr. Kaiser's employment with Grasshopper.  This is because Grasshopper and its counsel have refused to produce Kaiser for his deposition in this action.[13]

Even without Kaiser's deposition, however, it is perfectly clear that there has been serious violations of the California Rules of Professional Conduct.  Here is what is currently known about Kaiser and how he is actively assisting Grasshopper and its counsel in this litigation:

- Kaiser is now listed as the head of advertising and marketing at Grasshopper.  *Id*., ¶59.

- While Grasshopper did not serve a single deposition notice in this action for nearly ten months after filing suit, after filing its Motion to Dismiss its Complaint in this action on January 31, 2011, Grasshopper suddenly decided to serve no less than 9 deposition notices and subpoenas of Renaissance and its present and former employees, officers and consultants.  Doroshow Decl., ¶60, Ex. I. Grasshopper's motive for doing so is clear.  As it did in the *Accelerated Action*, knowing that Renaissance's Insurer would stop funding this litigation if Grasshopper dismissed its own claims, Grasshopper's strategy is to now to try to

---

[13]   Kaiser's deposition was noticed to be taken by Renaissance on February 22, 2011 before this Motion was filed.  Doroshow Decl., Ex. G.  Kaiser did not appear.  Doroshow Decl. ¶14, Ex. H.

1   drive up the cost of litigation so that Renaissance (who must now fund the

2   prosecution of its false advertising counterclaim on its own) will be forced to

3   dismiss or settle its counterclaim.[14]

4           While Grasshopper certainly has the right to take depositions in this action,

5   what is unusual about the 9 depositions Grasshopper now seeks to take is not only

6   the timing of the depositions after Renaissance no longer has insurance to fund this

7   litigation, but the identity of the witnesses Grasshopper now seeks to depose.  In

8   fact, Grasshopper has never served discovery in this action and there is no way

9   Grasshopper could possibly know the names, titles or location of several of the

10  individuals who Grasshopper now seeks to depose without active assistance from

11  someone who knows Renaissance's inside operations.  *See* Petrucci Decl., ¶8.  That

12  person of course is David Kaiser.

13      •   However, this Court need not speculate as to Kaiser's role in assisting

14  Grasshopper and its counsel (Charles Harder) in this litigation.  Any doubt has now

15  been laid to rest by information and documents Renaissance has recently obtained

16  from its insurer (Arch Insurance and it's claims adjuster, York Risk Services Group,

17  Inc.).

18          As shown in a series of emails attached to the accompanying Doroshow

19  Decl. at Ex. J, it has now been learned that Grasshopper and Prentiss have engaged

20  in repeated, unauthorized, *ex parte* communications with Renaissance's Insurer.

21  This, however, has not been limited to Grasshopper's owner (Chris Prentiss), *it has*

22  *also involved David Kaiser*.  Thus, according to an internal email to Rick Paggavina,

23  an Assistant Vice President with Arch Insurance in Stamford, Connecticut, from

24  _____

25  [14]  Remarkably, at the same time it has dismissed its claims, Grasshopper has also recently filed
    (on February 22, 2011, 10-3198 Dkt. 49) a Motion to Compel The Production of 90 categories of

26  documents, most of which have absolutely no relevance to Renaissance's counterclaims and are
    relevant (if at all) to Grasshopper's dismissed claims.  Doroshow Decl. at ¶68.  This Motion is

27  now scheduled to be heard by the Magistrate on March 15, 2011.

28

Richard Blair:

> "Hi Richard, our home office received a call *from plaintiffs counsel* on the above matter who wants to drop the case *but he says that our attorney won't let him. Could you place call David Kaiser to see what is going on with this. His number is 310-589-7984." (Id.*, ¶63, Ex. J (emphasis supplied).

Thus, there can be no doubt that Kaiser - - who, hired Attorney Doroshow to represent Renaissance in this action, and who clearly has attorney-client information materially related to this action - - is now actively assisting Mr. Harder and his firm in this litigation for Grasshopper; including engaging in clearly improper, *ex parte* communications with Renaissance's Insurer at Mr. Harder's behest. *Id.*

This, however, is not the end of the story. Emails have also been recently obtained from Renaissance's Insurer's claim's officer (Wayne Riniker) showing that Charles Harder clearly orchestrated his client's *ex parte* communications with Renaissance's Insurer to try to convince the Insurer to stop funding this litigation (exactly as Mr. Harder did in the *Accelerated Action*).

Thus, in a January 14, 2011 email from Mr. Harder to Chris Prentiss, Attorney Harder wrote to his client:

> "Below is Mr. Doroshow's statement that Renaissance will not stipulate to the dismissal of the Complaint."

Four days later (on January 18, 2011), Chris Prentiss in turn, then forwarded Attorney Harder's email to Renaissance's Insurer stating:

> "Good morning, Wayne (Riniker):
>
> Attached is Doroshow's response to our request that he stipulate to a dismissal of our suit against Renaissance. We must wait ten days before we file a motion to the court granting the dismissal. We plan on making that motion this week. I will forward that to you as soon as it is filed. Chris (Prentiss)"

*Id.*, ¶66, Ex. J.

### 3. <u>Attorney Harder's Refusal To Confer To Discuss This Motion And Refusal To Produce David Kaiser For His Deposition.</u>

In case there was any doubt about their knowledge of these emails, or what counsel and his clients were doing, Mr. Harder and his firm were sent copies of these emails, and asked to confer with Mr. Doroshow before this Motion was filed. *Id.*, ¶67, Ex. J.  However, as his office did in the *Accelerated Action* when shown the same type of improper *ex parte* communications with Accelerated's Insurer, Mr. Harder has again refused to meet as required under this Court's Local Rule 7-3, and declined to provide a response to Mr. Doroshow.  *Id.*, ¶67.  At the same time, Mr. Harder and his firm have refused to produce Mr. Kaiser for his deposition.  *Id.* ¶14 and Ex. H.

Thus, Renaissance must now move to disqualify Mr. Harder and his firm without having the opportunity to depose Kaiser before filing this Motion, or having had the opportunity to confer with Mr. Harder before this Motion was filed.

## III.   ARGUMENT

### A.   General Legal Standards

Courts have inherent powers, independent of statute, derived from two distinct sources: the court's equitable power derived from the historic power of equity courts, and the supervisory or administrative powers which all courts possess to enable them to carry out their duties.  As the Supreme Court stated, "It has long been understood that '[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution," powers which cannot be dispensed with in a Court because they are necessary to the exercise of all others.'"  *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (citations omitted).  "For this reason, 'Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect and decorum, in their presence, and the submission to their lawful mandates.'"  *Id.*  "These powers are governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases."  *Id.*

The inherent power of the courts extends to "a full range of litigation abuses." *Id.*  This power encompasses the means necessary to curb abuses, promote fair process, and preserve the integrity of the judicial system.  It includes the power to conduct its own investigation; to punish for contempt both conduct before the court and conduct "beyond the court's confines"; and to fashion an appropriate sanction for conduct which abuses the judicial process including outright dismissal of a lawsuit, disqualification of counsel, and assessment of attorneys' fees and costs.  *Id.* at 44-45 (citations omitted); *see also Aloe Vera of Am., Inc. v. U.S.*, 376 F.3d 960, 964-665 (9th Cir. 2004) (all "Federal courts are vested with inherent powers enabling them to manage their cases and courtrooms effectively and to ensure obedience with their orders . . .  As a function of this power, courts can dismiss cases in their entirety, bar witnesses, award attorneys' fees and assess fines.").  The broad "spectrum of sanctions provided by statute or rule must be available to the district court in appropriate cases, not merely to penalize those who might be tempted to such conduct in the absence of such a deterrent."  *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 643 (1976).

California law is in accord.  A trial court's authority to disqualify an attorney derives from the power inherent in every court, "[t]o control to disqualify an attorney derives from the power inherent in every court, "[t]o control in furtherance of justice, the conduct of its ministerial officers, and of all other persons in any manner connected with a judicial proceeding before it, in every matter pertaining thereto."  *Code Civ. Proc.*, § 128, subd. (a)(5); *People ex rel. Clancy v. Superior Court* (1985) 39 Cal. 3d 740, 745 218 Cal. Rptr. 24; *Comden v. Superior Court* (1978) 20 Cal.3d 906, 916, fn. 4, 145 Cal.Rptr. 9; *Gregori v. Bank of America* (1989) 207 Cal.App. 3d 291, 299-300, 254 Cal.Rptr. 853.

Preserving confidentiality of communications between attorney and client is fundamental to our legal system.  The attorney-client privilege is a hallmark of Anglo-American jurisprudence that furthers the public policy of insuring " 'the right

of every person to freely and fully confer and confide in one having knowledge of the law, and skilled in its practice, in order that the former may have adequate advice and a proper defense.' [Citation.]"  *Mitchell v. Superior Court*, (1984) 37 Cal.3d 591, 599, 208 Cal.Rptr. 886.  One of the basic duties of an attorney is "[t]o maintain inviolate the confidence, and at every peril to himself or herself to preserve the secrets, of his or her client." *Bus. & Prof. Code* § 6068, subd. (e).  To protect the confidentiality of the attorney-client relationship, the California Rules of Professional Conduct bar an attorney from accepting "employment adverse to a client or former client where, by reason of the representation of the client or former client, the [attorney] has obtained confidential information material to the employment except with the informed written consent of the client or former client." *Rule Prof. Conduct* 3-310(d); *Western Continental Operating Co., v. Natural Gas Corp.*, (1989) 212 Cal. App. 3d 752, 759.

For these reasons, an attorney will be disqualified from representing a client against the former client when there is a substantial relationship between the two representations.  *Western Continental*, 212 Cal.App.3d at 759-760; *River West, Inc. v. Nickel*, (1987) 188 Cal.App.3d 1297, 1303-04.  When a substantial relationship exists, the courts presume the attorney possesses confidential information of the former client material to the present representation.  (*Ibid.*)

**B.**  **Attorney Harder And His Firm Should Be Disqualified For Enlisting David Kaiser To Assist Them In This Litigation Against His Former Employer**

This Motion involves a rare set of circumstances, *i.e.*, one where a former employee (Kaiser) who has confidential attorney-client information materially related to this litigation leaves to join a party (Grasshopper and Prentiss) adverse to his former employer (Renaissance).  Rare though it is, the issue has been considered by several courts in California, notably in *In re Complex Asbestos Litigation*, (1991) 232 Cal.App. 3d 572.  In that decision, the California Court of Appeals stated:

"Hiring a former employee of an opposing counsel is not, in and of itself, sufficient to warrant disqualification of an attorney or law firm.  However, when the former employee possesses confidential attorney-client information, materially related to pending litigation, the situation implicates" '. . . considerations of ethics which run to the very integrity of our judicial process.'  [Citation.]"  (*Comden v. Superior Court, supra,* 20 Cal.3d at p. 915, fn. omitted.)  Under such circumstances, the hiring attorney must obtain the informed written consent of the former employer, thereby dispelling any basis for disqualification.  (Cf. *Rules Prof. Conduct, rule 3-310(D)* see *Civ. Code, § 3515* ("[One] who consents to an act is not wronged by it.")  Failing that, the hiring attorney is subject to disqualification unless the attorney-client information has been used or disclosed in the new employment."

Here, Kaiser clearly has confidential attorney-client information materially related to this action.  In fact, he himself has provided sworn testimony (in the Oregon Action) confirming that he hired Renaissance's lead counsel (Mr. Doroshow) to defend this action.  Doroshow Decl. ¶54, Ex. F.  Mr. Doroshow also has submitted a sworn declaration with this Motion attesting to the fact that, when Mr. Kaiser hired him, they discussed not only the legal strategy Renaissance would employ in defending this action, but also the counterclaim that still remains pending before this Court.  *Id*. ¶56.

There is also no question that Kaiser is now actively assisting Grasshopper and its counsel in this lawsuit against his former employer.  As shown above, depositions are now being noticed of individuals whose relationships with Renaissance are clearly being explained to Grasshopper's counsel by Kaiser.  Petrucci Decl. at ¶8.  Moreover, Kaiser has clearly been shown to be engaged in improper, *ex parte* communications with Renaissance's Insurer at the behest of Attorney Harder and his clients.  Doroshow Decl. at ¶64.  Thus, contrary to the Rules of Professional Conduct, there has been no ethical wall or other steps taken to

prevent the disclosure and use of privileged information.

For this reason alone, Mr. Harder and his firm must be disqualified from continuing to serve as counsel in these proceedings.

At the same time, Renaissance seeks an order directing that Grasshopper and Prentiss produce any and all contacts, direct or indirect, including but not limited to oral, written, and electronic (paper, telephone, voicemail, recorded message, e-mail) reflecting communications with Renaissance's Insurer, Renaissance asks that the Court impose appropriate sanctions including evidence sanctions, issue preclusion, judgment on Renaissance's remaining counterclaim, and an award of attorneys' fees and costs. [15]

## C.   Attorney Harder And His Firm Should Be Disqualified For Engaging In Improper Ex Parte Communications With Renaissance's Insurer

The unsolicited, *ex parte* communications by Prentiss, Kaiser and Harder with Renaissance's Insurer, were also clearly improper.  The obvious intent of such improper communications was to try to drive a wedge between Renaissance, its Insurer and their counsel, Fox, and coerce Renaissance's to dismiss its remaining counterclaim by convincing Renaissance's Insurer to stop funding this litigation. Indeed, in an e-mail criticizing Accelerated and Mr. Doroshow for refusing to *capitulate* Grasshopper's and Prentiss' demands in the *Accelerated Action*, Prentiss made his intentions perfectly clear:

> (a)ttached are several documents pertaining to many efforts that I and my legal counsel have made to try to settle this case with Kevin Kelly, CEO … and his attorney, James Doroshow … our offers were rejected; Accelerated's response was to demand large payments from us, and other onerous terms.

---

[15]   Motions to disqualify are normally decided on the basis of the declarations and documents submitted by the parties.  However, in the event this Court requires further evidence to fully decide this Motion, Renaissance requests the opportunity to depose Mr. Kaiser and/to to have this Court conduct an evidentiary hearing to fashion appropriate relief.

More recently, we asked Accelerated and its counsel … to agree to allow us to voluntarily dismiss all of our claims against Accelerated … Accelerated refused, which required us to file a motion … Accelerated and its counsel are aggressively opposing that motion. Paragraph 3 of Mr. Doroshow's declaration attached to the Opposition papers (attached) seems to summarize the reason for the refusal – because if our claims are dismissed, Hanover will stop paying Accelerated's (Doroshow's) enormous legal bills, which are being used to fund Accelerated's Counterclaims against us… My estimate is that the great majority of his billing is spent on Accelerated's counterclaims against us, rather than defending our claims against his client – because we stopped pressing our suit long ago.

*See* Doroshow Decl., Ex. A.

Attorney Harder has no right to direct his clients to engage in *ex parte* communications with an adverse party's insurer. RPC 2-100 expressly prohibits both direct and <u>indirect</u> communication with a represented party: "While representing a client, a member shall not communicate directly or indirectly about the subject of the representation with a party the member knows to be represented by another lawyer in the matter, unless the member has the consent of the other lawyer."

The California Supreme Court confirmed that the policy underpinning RPC 2-100 is "the preservation of the attorney-client relationship and the proper functioning of the administration of justice." The Rule is designed specifically to "shield[] the opposing party not only from the attorney's approaches which are well intended but misguided." At its core, the rule "was designed to permit an attorney to function adequately in his proper role and to prevent the opposing attorney from impeding his performance in such role." *Mitton v. State Bar*, (1969) 455 P.2d 753 (discussing former Rule 12 which read, in part: "a Member of the State Bar shall not communicate with a party represented by counsel upon a subject of controversy, in the absence and without the consent of such counsel"); *Heavey v. State Bar*, (1976) 551 P.2d 1238 (improper *ex parte* contacts violate a duty of fairness owed to opposing counsel. They prevent opposing counsel from effectively performing his role as an attorney); *accord ABA Comm. On Ethics and Prof's Responsibility*, Formal Op. 95-396 (1995) (stating rule prohibiting such communications is

designed to protect the represented but uncounseled layperson against overreaching by adverse counsel and to safeguard the integrity of the client-lawyer relationship).

In a 1993 Formal Opinion, No. 1993-131 (Doroshow Decl., Ex. N), the State Bar of California, Standing Committee On Professional Responsibility And Conduct, addressed almost identical facts and circumstances and confirmed that when the content of the communication to be had with the opposing party originates with and is directed by the attorney it is prohibited by Rule 2-100. Thus, though an attorney may confer with the client as to strategy to be pursued in, the goals to be achieved by, and the general nature of the communication the client intends to initiate with the opposing party, the attorney is prohibited from counseling a client to engage in such communications. In fact, Formal Opinion 1993-131 suggests that the attorney "attempt to dissuade the client from such and, to the extent it occurs, assure that the attorney is not involved in and provides no guidance to the client in preparing the communication." More to the point, Formal Opinion 1993-131, provides that:

> "When the content of the communication to be had with the opposing party originates with or is directed by the attorney, it is prohibited by rule 2-100. Thus, an attorney is **prohibited from drafting documents, correspondence, or other written materials, to be delivered by an opposing party** represented by counsel even if they are prepared at the request of the client, are conveyed by the client and appear to be from the client rather than the attorney.
>
> . . .
>
> An attorney is also **prohibited from scripting the questions to be asked or statements to be made** in the communications otherwise using the client as a conduit for conveying to the represented opposing party words or thoughts originating with the attorney."

*See* Doroshow Decl., Ex. N (emphasis added); *see also* Formal Op. 1996-145 (stating, "[t]he prohibition of rule 2-100 is applicable regardless of whether the communication is initiated by the party rather than the attorney").

Here, there is no dispute that Grasshopper, Prentiss, Kaiser and their attorneys all know Renaissance and Petrucci are represented by Fox, counsel of Record. *See*

*Abeles v. State Bar,* (1973) 9 Cal. 3d 603 (holding that knowledge that plaintiff had attorney of record constituted "knowledge" that the party was represented notwithstanding plaintiff's statement that he was not represented.).[16]  Here, Kaiser in fact hired Mr. Doroshow to defend Renaissance and Petrucci against Grasshopper's claims.  Likewise, there is no dispute that Grasshopper, Prentiss, Kaiser and their attorneys all knew that Renaissance was being defended by their carriers and, hence, that the Insurer was a client of and represented by Fox in this matter.  *See State Farm Mut. Auto. Ins. Co. v. Federal Ins. Co.*, 72 Cal.App.4th 1422, 1428 (1999) (holding "an attorney-client relationship is formed between an insurance company and the counsel it hires to defend an insured . . . ."); *see also American Mut. Liab. Ins. Co. v. Superior Court*, 38 Cal. App.3d 579, 591-92 (1974) (stating, that "(i)n such a situation, the attorney has two clients whose primary, overlapping, and common interest is the speedy and successful resolution of the claim and litigation. . . . which lasts during the pendency of the claim or litigation against the insured").

RPC 2-100 quite clearly placed the responsibility on counsel to avoid communicating or attempting to communicate with Renaissance or its Insurer unless and until he had secured Fox Rothschild's consent or had obtained permission from the Court.  He did not do either.  Moreover, it is obvious that the sole purpose of these communications was to interfere with Fox Rothschild's attorney-client relationship.

---

[16]   In *Abeles*, defense counsel knew that a law firm had appeared as attorney of record for the plaintiff.  During the litigation, the defense attorney and the plaintiff ran into each other at a restaurant.  The Plaintiff told the defense lawyer that the law firm did not represent him and was not authorized to file any lawsuit on his behalf.  Based on this information, defense counsel later met with the plaintiff and had him sign an affidavit which repudiated certain allegations of the complaint and expressly stated that he did not authorize the filing of the claim.  The court held that the attorney violated rule 12, a predecessor to rule 2-100.  The court found that the knowledge that the plaintiff had an attorney of record constituted "knowledge" that the part was represented.  The plaintiff's representations to the contrary did not eradicate this knowledge.

To determine the nature, scope and extent of a violation of the RPC[17]—where, as here, counsel have declined to state on the record whether they were aware of and/or participated in his clients' communications and have declined to produce any communications—this Court should conduct an inquiry.  As before, Renaissance reasonably anticipates that an assertion of privilege will be made and, therefore, requests that the Court order Grasshopper, Prentiss, Kaiser and their counsel to provide all materials to the Court for an *in camera* inspection within seven (7) days. Further, Grasshopper respectfully submits that the Court conduct an evidentiary hearing and examine Chris Prentiss, Pax Prentiss, David Kaiser and their counsel to determine, among other things,

- When and how Attorney Harder learned that Chris Prentiss and David Kaiser would be sending an *ex parte*, unsolicited e-mail to Accelerated's Insurer;

- Whether Mr. Harder, or his partners/associates counseled and assisted Prentiss in doing so; and the nature and extent of their involvement including whether they drafted or reviewed/approved drafts of the e-mail communication; and

- The reason the communication was not directed to and through counsel at Fox.[18]

---

[17]   A violation of RPC 2-100 would also result in a violation of other provisions of the RPC, such as the prohibition against knowingly violating an obligation under the rules of a tribunal; the prohibition against violating or attempting to violate a Rule of Professional Conduct and the prohibition against engaging in conduct prejudicial to the administration of justice.

[18] When a district court sanctions an attorney or a party based on its inherent powers, '(a) primary aspect of (its) discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process.'"  *Chambers*, 501 U.S. at 44-45 (alterations in original).  The requested disqualification is clearly a reasonable sanction and deterrent under the circumstances presently known, particularly since this is the second time that counsel has engaged in these serious ethical violations.  Such a sanction is appropriate because it is designed to stop the offending conduct and deter similar conduct in the future.  *See Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 643 (1976) (stating that "spectrum of sanctions provided by statute or rule must be available …, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent.").

Evidencing a consciousness of guilt, Grasshopper's and Prentiss' counsel have refused to meet-and-confer on the record regarding their knowledge or and involvement in the improper,
(footnote continued)

**D.** **The Court Should Also Impose Monetary Sanctions To Compensate Renaissance For The Expense Of Having To Prepare and File This Motion**

Sanctions are particularly appropriate where one party has acted "in bad faith, vexatiously, wantonly or for oppressive reasons." *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 766 (1980); *Fink v. Gomez*, 239 F.3 989, 991-92 (9th Cir. 2001) (stating that Supreme Court, in *Chambers*, "left no question" that the court has inherent power to impose sanctions when a party "has acted in bad faith, vexatiously, wantonly, or for oppressive reasons, delaying or disrupting the litigation, or has taken actions in the litigation for an improper purposes.") Sanctions are particularly appropriate where a litigant is substantially motivated by vindictiveness, obduracy, or *mala fides*. *Fink*, 239 F.3d at 993 (quotation marks omitted).

Counsel for Defendants has spent in excess of 14 hours preparing these moving papers. Counsel's standard hourly billing rate is $550. Thus, in addition to the other relief requested in this Motion, Renaissance seeks monetary sanctions in the amount of no less than $7,700 to compensate it for the expense of having to prepare and present this Motion. Defendants will submit a supplemental declaration at or following the April 4, 2011 hearing setting forth their total costs involved in bringing this motion.

**IV.** **CONCLUSION**

---

unsolicited, *ex parte* communications. In fact, as noted, in this regard, Mr. Harder has attempted to hide behind the cloak of privilege. Assuming, solely for the purposes of argument, that such communications are privileged, that does not alter the fact that this Court can and should hold Plaintiffs/Counterdefendants accountable and conduct the necessary inquiry to determine the nature, scope and extent of the violation of the California Rules of Professional Conduct.

For all the foregoing reasons, Renaissance respectfully requests that the Court enter an appropriate order that (1) disqualifies Charles Harder and his firm from any further representation in this matter; (2) orders that Grasshopper, Prentiss, Kaiser's and their counsel produce to this Court for *in camera* inspection all notes, memoranda, correspondence, and electronic communications concerning Prentiss', Kaiser's, and their counsel's unsolicited telephone calls and e-mails to Renaissance's Insurer within seven days; (3) that this Court schedule and conduct an evidentiary hearing regarding the nature, extent and scope of violations of the California Rules of Professional conduct and impose sanctions appropriate sanctions including issue preclusion, evidentiary sanctions, and/or judgment in connection with Renaissance's counterclaim, together with and award of attorneys' fees and costs, and (4) that this Court stay any discovery by Plaintiffs and

1 | Counterdefendants in this action until after the Court fully considers and rules on

2 | this Motion.

3 | Respectfully submitted,

4

5 | DATED:  March 1, 2011                    FOX ROTHSCHILD, LLP

6

7 | By /s/ James E. Doroshow

8 | James E. Doroshow
Aaron Craig
1800 Century Park East, Suite 300

9 | Los Angeles, CA 90067

10 | Attorneys For
Defendants/Counterclaimants

11 | Renaissance Recovery Services, LLC,
NNB Recovery Services and Salvatore

12 | Petrucci

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28